Brad H. Bearnson (#3633)
Wayne K. Caldwell (#9466)
Aaron K. Bergman (#13147)
BEARNSON & CALDWELL, LLC
*Attorneys for Plaintiff*
399 North Main, Suite 270
Logan, Utah 84321
Telephone: (435)752-6300
Facsimile: (435)752-6301
Email: bbearnson@bearnsonlaw.com
Email: wcaldwell@bearnsonlaw.com
Email: abergman@bearnsonlaw.com
*For emails, please cc: pi.paralegal1@bearnsonlaw.com*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| EMILY ARTHUR, by and through her Legal Guardian, Julie Arthur, <br><br> Plaintiff <br><br> v. <br><br> UTAH STATE UNIVERSITY, a subdivision of the State of Utah; SUE REEVES, an individual; TIMOTHY A. SLOCUM, an individual; SARAH BODILY, an individual; JEFF SHEEN, an individual; HEIDI KESLER, an individual; and DOES 1 through 50, inclusive, <br><br> Defendants. | **SECOND AMENDED COMPLAINT** <br> **&** <br> **JURY DEMAND** <br><br><br><br><br><br> Appointed Magistrate: Jared C. Bennett <br><br> Case No. 2:20-cv-00540-JCB |

COMES NOW Plaintiff, EMILY ARTHUR, by and through her legally appointed

guardian, Julie Arthur, and by and through her attorney, Aaron K. Bergman and

BEARNSON AND CALDWELL, LLC, and hereby complains against

Defendants   UTAH   STATE UNIVERSITY; TIMOTHY A. SLOCUM; SUE REEVES; SARAH BODILY; JEFF SHEEN; and DOES 1 through 50, as follows:

<u>**NATURE OF ACTION**</u>

1.      This action seeks damages and injunctive relief against the Utah State University for its unlawful discrimination and expulsion of Emily Arthur, a disabled person.

<u>**PARTIES**</u>

2.      Plaintiff EMILY ARTHUR (hereinafter "Emily") resides in Salt Lake County, Utah. Emily was born disabled, having Down syndrome, causing developmental and intellectual delays. Pursuant to Rule 17 of the Utah Rules of Civil Procedure, Emily appears with the help of her legal guardian, Mrs. Julie Arthur, who is also Emily's biological mother (hereinafter "Mrs. Arthur").

3.      Defendant TIMOTHY A. SLOCUM is residing in Cache County, Utah.

4.      Defendant SARAH BODILY is residing in Cache County, Utah.

5.      Defendant SUE REEVES is residing in Cache County, Utah.

6.      Defendant JEFF SHEEN is residing in Cache County, Utah.

7.      Defendant HEIDI KESLER is residing in Cache County, Utah.

8.      Defendant UTAH STATE UNIVERSITY is a system of higher education (hereinafter referred to at times as "USU"). In or about the fall of 2014, Defendant USU began to offer a pilot program called "Aggies Elevated." (Hereinafter referred to at times as the "AE Program"). The AE Program is conducted by Defendant USU's Center for

Persons with Disabilities, which is a unit of the Emma Eccles Jones College of Education and Human Services.

9.     While the Individuals with Disabilities Education Act, and its predecessor, ensures primary-years education to disabled students, and while the Americans with Disabilities Act has been in existence since year 1990, Defendant's AE Program was brought to fruition by virtue of a 2010 announcement, by the Office of Postsecondary Education ("OPE"), which announcement set forth the availability of grants for "Transition Programs for Students with Intellectual Disabilities" ("TPSID").

10.     As a prerequisite to obtaining the TPSID grant, Defendant's AE Program was required to utilize such grant proceeds for students with mental retardation or cognitive impairment characterized by *significant* limitation in intellectual and cognitive functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills.[1]

11.     In other words, by making such grants available to Defendant, the OPE intended such funds to be used for those with significant limitations resulting from their disability. By way of example, the principal purpose of such funding was not to make transition programs available to those with school-related anxiety, moderate learning disabilities, attention-deficit-disorder, autism spectrum disorders, etc. Rather, the OPE intended that TPSID grants would be utilized in such a manner as to encourage transition

---

[1] See https://www2.ed.gov/programs/tpsid/tpsid-2010-competition-faqs.pdf (03/23/2020).

programs for those students whose disabilities were significant enough to have previously denied them access to higher education.

12.     Defendant USU advertised the AE Program as though it met the goals and criteria of the TPSID grant, stating the program "offers the same promise that a college education does to any other young adult."[2]

13.     Two years after starting the AE Program, Defendant received one-point-one million dollars ($1.1M) in grant monies from the OPE. Defendant received more grant money than it would have, because Defendant purported that it would be providing its AE Program students with greater support, such as second-year AE Program students rooming in dorms with first-year AE Program students, mentors, living support personnel, and so forth.

14.     In 2016, Defendant began making plans to submit an application for Comprehensive Transition Program ("CTP") status, which would make additional federal funding and aide available to Defendant's students, and thereby to Defendant.[3]

15.     Defendant obtained its goal:

> UPDATE: We have been approved as a Comprehensive Transition Program by the Federal Government so students can complete the FAFSA! Aggies Elevated has begun the process to become a Certified Transition Program, which would allow qualified students to file the Free Application for Federal Student Aid (FAFSA). Title IV of the Higher Education Opportunity Act (2008) allows eligible

---

[2] See https://aggieselevated.usu.edu/stories/news (03/23/2020); see also https://www.ksl.com/article/31501088/usu-launches-program-for-students-with-intellectual-disability (03/23/2020, via https://www.aggieselevated.usu.edu/stories/news).

[3] See https://www.usu.edu/trustees/agenda/2016/pdf/03-04-16.pdf (03/23/2020)

students with intellectual disabilities attending CTPs to receive federal financial aid in the form of Pell Grants, Federal Supplemental Education Opportunity Grants, or Work-Study program funds.

See https://aggieselevated.usu.edu/program/ctp (03/23/2020).

## JURISDICTION & VENUE

16.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

17.   This Court has venue pursuant to 28 U.S.C. § 1391.

18.   Defendant USU has no immunity for violations of Title II of the Americans with Disabilities Act and its implementing regulations where such violations can be traced to constitutional violations.

19.   Defendant USU has no immunity for violations of section 504 of the Rehabilitation Act and its implementing regulations.

20.   The individual Defendants have no immunity as to any valid claims that may be pursued by the relief mechanism set forth under 42 U.S.C. § 1983.

## STATEMENT OF FACTS

21.   Emily applied to the AE Program as an accomplished high school graduate, and being the first student with Down Syndrome in the Canyons School District to receive a diploma.  Emily's earnest wish was to be able to attend college. Her goal was to eventually work at a daycare/preschool program for children with Down syndrome, and she had been actively participating in the child development  preschool program to help prepare for that role.

22.     During high school, Emily had been a model student. She did not have any reported misbehaviors of any significance, had been on the honor roll multiples time throughout high school, and had never been previously disciplined in regards inappropriate sexual behavior towards others or herself.

23.     At graduation, Emily was invited to speak, and provided a well thought-out presentation which she herself wrote. See Graduation Speech, attached hereto as Exhibit "A."

24.     Prior to Emily's graduation, Emily identified the AE Program as one of three programs of interest, and after substantial research determined to pursue enrollment with the AE Program, whose application processwas quite extensive.

25.     Prior to filing an application to the AE Program, Emily's mother, Julie Arthur (hereinafter "Mrs. Arthur") reached out to the AE Program, and was directed to communicate with Sue Reeves, the assistant director of the AE Program, regarding any questions that she had regarding Emily's prospective application to the AE Program.

26.     Julie engaged in substantial correspondence with Ms. Reeves over the course of spring 2017, including discussions regarding what standards the AE Program had for incoming applicants, what the interview process would be for applicants to the AE Program, whether Emily would be a good fit for the program, and whether Ms. Reeves could identify any potential concerns that she had with Emily's admission into the AE Program.

27.     Over several conversations between Julie, Emily, and Ms. Reeves, including one in person conversation that occurred in fall of 2017, Ms. Reeves did not at any point indicate that she had any concerns about Emily's appropriateness for the AE Program.

28.     Rather, Ms. Reeves represented on multiple occasions that Emily was perfect for the AE Program and further indicated her confidence that Emily would be accepted into the AE Program, and would thrive through the course of the program.

29.     Emily applied in the fall of 2017, and was notified in February 2018 of her provisional acceptance into the AE Program via a letter signed by Sarah Bodily, the director of the AE Program. Emily was one of only two students admitted into the AE Program on a provisional basis for fall of 2018.  Upon information and belief, the other student admitted to the program on a provisional basis was also a student who was diagnosed with Down Syndrome, and had similar developmental and intellectual delays as Emily.

30.     At the time of her provisional admission into the AE Program, Emily also received a Letter of Acceptance to Utah State University, and further received a full standard freshman introductory packet to Utah State University.

31.     When Mrs. Arthur inquired of Sarah Bodily the basis for Emily's provisional acceptance into the AE Program, Sarah Bodily informed Julie that the AE

Program had "had bad experiences in the past" with students that had similar disabilities to Emily.

32.     At the USU orientation meeting in February of 2018, Emily was first introduced to Sarah Bodily, Sue Reeves, Jeff Sheen (the Associate Director of Research and Training at the Utah State University Center for Persons with Disabilities), and Matt Wappett (the Executive Director of the Utah State University Center for Persons with Disabilities).

33.     Emily was also required to attend a USU orientation meeting in June of 2018, where Defendant USU divided students from their families for the day—with Sarah Bodily staying with and instructing parents and Sue Reeves working with the students—and took the prospective students through campus independently, and performed activities with the prospective students for the duration of the day.

34.     It was further indicated at both orientation meetings that mentors would be assigned to each member of the AE Program.

35.     During the orientation meeting, Mrs. Arthur inquired of Sarah Bodily how many prior students had failed to complete the AE Program and was informed that only one student had failed to complete the program.

36.     At this time, Mrs. Arthur further inquired privately of Sarah Bodily whether there were any concerns on the part of AE that Emily was not fully prepared to attend

USU as part of the AE Program. Sarah informed Julie that the AE Program would not have accepted Emily unless she was ready to be there.

37.     While Julie was meeting with Sarah Bodily, Sue Reeves had taken the AE Program students on a series of activities around campus. Emily fully participated in each of these activities, and at no point were any concerns raised about Emily's participation in the AE Program.

38.     At the June USU orientation meeting, the parents were informed that, on the Sunday before the AE Program participants begun their connections courses, there would be one final meeting between the parents, the students, and the AE Program staff to cover any additional concerns the parents might have, answer any questions, and be assigned their mentors.

39.     Throughout the summer of 2018, Emily participated in the common freshmen reading assignment, wherein, among other things, she was required to read and report on a college level novel. Emily also was required and did participate in weekly video conferences with Defendants Sarah Bodily, Jeff Sheen, and Sue Reeves, who would ask questions and engage in discussions with Emily about her assignments.

40.     With the help of her parents, Emily moved into her designated dorm. Emily arrived approximately one (1) week before actual classes started, to participate first in the Aggies Elevated Base Camp, where students were given their courses to attend, campus was navigated, etc.; and then in the required "connections course," required of all

beginning students. Emily's parents arrived, trusting in the supports that Defendant USU, Jeff Sheen, Sarah Bodily, and Sue Reeves had promised would be provided to Emily. Such included a second-year AE Program student as Emily's dorm companion; a mentor to help Emily navigate the campus and classes; and tutoring to help Emily complete her assignments.

41.     On Emily's arrival, Defendants had not assigned Emily a mentor; had not provided for any anticipated tutoring; and had provided Emily with a first-year AE Program student roommate who was not capable of helping Emily to acclimate to the AE Program.

42.     Further, on the Saturday Emily arrived, no technical support was available to assist Emily in moving in to her dormitory.  Specifically, as part of Emily's daily routine, Emily used a Google Home Mini to help her maintain a schedule, wake up at appropriate times, dress appropriately for the weather, and generally stay focused and on task.

43.     Because no tech support was available, and because of the security technology used by USU, Emily was unable to install her Google Home Mini.

44.     On the Sunday before orientation week, AE Program participants had been told that there would be a dinner for AE Program students, where students were to be introduced to their mentors. Parents arrived with their new and excited students, only to find the facilities where the dinner was intended to take place locked. Eventually Sue

Reeves arrived, placed a box of pizza onto a table without plates, utensils, or beverages, and invited everyone to eat. Emily's parents were told this was her final goodbye to her parents. No instructions were provided to Emily regarding campus, dorm life, classes, etc. Further, AE Program staff did not communicate with parents regarding their students, and further congregated to the side of the activities, failing to answer questions or address concerns raised by the parents.

45. During the course of the dinner, Mrs. Arthur informed Defendant Sarah Bodily of the necessity for Emily's Google Home Mini to be properly installed and functioning in order to allow Emily to succeed in her orientation program. Defendant Sarah Bodily promised Mrs. Arthur and Emily that there would be a session early Monday morning where all the AE Program students would receive help in setting up the technology they needed to be successful. It was further represented that during that session Emily's Google Home Mini would be set up properly.

46. On leaving campus, Emily's father remarked how worried he was about Emily with the lack of support being provided. However, Emily's parents determined to trust the assurances of the Defendants that these supports would be promptly provided by the very following morning.

47. None of the long-promised supports were provided. No members of the AE Program arrived on Monday morning to install the Google Home Mini, and no mentor was assigned to assist Emily in traversing campus. Instead, Mrs. Arthur called

Emily on Monday morning to ensure that she was awake and prepared to participate in her AE Program Base Camp Course, and Emily traveled to the AE Program building by herself to join the other AE Program students.

48.     Emily successfully attended and fully participated in the AE Program Base Camp Course on both Monday and Tuesday, despite the failure of Defendants to provide the necessary, promised support.  Each day, Mrs. Arthur would call Emily and ensure that she was awake and to all her classes on time, as Emily still had not received the promised assistance in installing her Google Home Mini.

49.     Throughout the week, Mrs. Arthur called Emily's dorm resident assistant for an accommodation, to simply knock on Emily's door to ensure that Emily had gotten up to go to class. The RA informed Mrs. Arthur that such was not allowed.

50.     On numerous occasions, the AE Program scheduled an appointment for Emily to meet staff at the AE Program building for the purposes of installing her Google Home Mini.  However, each time these appointments were scheduled at a time that Emily was scheduled to still be in her connections course.

51.     On Tuesday, August 21, 2018, Emily attended a school-sponsored dance. There was no known incident of concern, and Emily returned to her dorm.  Further, on Wednesday, Mrs. Arthur received a text from Emily's connections course professor's assistant. The assistant informed Mrs. Arthur that Emily was in the professor's class, but that the AE Program failed to inform the necessary people, and those providing

instruction and assistance to the students did not know "what to do" with Emily. They had never had a student with Down syndrome, asserted the professor's assistant. "Can she read, can she write?"

52.     On Wednesday, August 22, 2018, Emily participated in an evening "dine-around" activity, visiting different eateries in Logan, Utah, with her peers. There was no known incident of concern, and Emily returned to her dorm.

53.     On Thursday, August 23, 2018, Emily went with her peers to an "escape-room" activity. There was no known incident of concern, and Emily returned to her dorm.

54.     On Friday, August 24, 2018, Emily did not get up in time. Defendant still had not provided Emily with tech support for her Google Home Mini. When Emily did not present for class, Defendant Jeff Sheen went to Emily's dorm. In the meantime, Emily had awoken, gotten ready, and rushed past Defendant Sheen to get towards class.–

55.     Defendant Sheen stopped Emily, and proceeded to lecture Emily about proper use of alarms and getting to class on time. Defendant Sheen later reported to Mrs. Arthur "I talked to Emily and told her what she needs to be doing." Mrs. Arthur retorted back to Sheen that Emily's Google Home Mini needed to be set up still. Defendant Sheen responded that he had told Emily what she needs to do, and "I should not have to go over to the dorm and wake her up and take care of her."

56.    Though Defendant USU, Defendant Sheen, Defendant Sarah Bodily, and Defendant Sue Reeves had all promised that Emily would be given support in installing her Google Home Mini days ago, Defendants instead resorted to asking Mrs. Arthur to come up that coming Saturday, August 25, 2018, to set up the Google Home Mini herself.

57.    During the course of Mrs. Arthur's conversation with Defendants on Friday, August 25, 2018, Defendants at no point indicated that Emily had in any way acted inappropriately, or that there were concerns about Emily's ability to fully complete the AE Program.  Instead, Defendants indicated that this would be a simply, routine visit for Mrs. Arthur, with Defendant Sheen going so far as to invite Mrs. Arthur to "have ice cream" when she arrived on campus the next morning.

58.    Mrs. Arthur arrived at Defendant USU's facilities for the purposes of installing Emily's Google Home Mini, but on arrival instead received a request to come to a meeting. Defendants Sheen and Reeves were present.

59.    For approximately 3 hours, Defendants proceeded to tell Mrs. Arthur that Emily was not ready for college. Mrs. Arthur was told, for the first time, that Emily had failed to present to class on time, and to attend required meetings. Defendants also told Mrs. Arthur, for the first time, that during the prior night at a dance, the Director of Student Retention Heidi Kesler had physically taken ahold of Emily, and removed her from the dance. All that Defendants knew was that according Kesler, Emily was dancing

'inappropriately'.   Defendants did not know or understand what 'inappropriately' entailed, and in reality, Emily was merely dancing like her peers, which made Kesler "uncomfortable." So speedy was Emily's removal that Emily left some of her personal items inside the dance hall, and had to return to recover them.

60.    During the course of the meeting, Defendant Sheen indicated when asked what 'inappropriately' meant that "we can only assume she [Emily] was grinding on boys".   Further Defendant Sheen represented to Mrs. Arthur that the AE Program functioned solely by the "grace of the University."   Defendant Sheen further indicated that Emily's presence on campus risked the continued existence of the AE Program, and Defendants collectively requested that Emily be taken home.

61.    Defendants further represented that Emily presented a "safety issue" to herself, and attempted to characterize their request that Mrs. Arthur remove Emily from USU as a "safety concern".

62.    Before the August 25, 2018 meeting, even on the extremely limited information they had, Defendants predetermined to immediately dismiss Emily from the AE Program. Defendant Sheen wrote, including all of the individual Defendants, it is "our intentions to release Emily from the program at this time."

63.    Desperate to dissuade Defendants and thereby avoid the damage it would cause Emily, Mrs. Arthur pleaded for lenience.

64.     Defendants indicated that they could potentially allow Emily to continue to participate in the AE Program, but that doing so would require Emily to enter into a 'behavior contract.'

65.     The behavior contract was extremely punitive in nature, and sought to punish Emily for the very accommodations that Defendant had failed to provide. Specifically, Emily was to present to class on time. If she failed to do so, the consequence was expulsion.

66.     Emily also would be required to send text messages or "check ins," which messages had to be sent by Emily to three (3) separate individuals, every day, morning, and afternoon. If Emily failed to do so, the consequence was expulsion.

67.     Emily was also forbidden from looking at her phone, for any duration of time during any class. If Emily failed to 'stow' her phone away, the consequence was expulsion.

68.     Incongruently, Defendants required Emily "will not ignore calls/texts/e-mails from people who are trying to reach her." Any single failure to respond would similarly result in expulsion.

69.     Furthermore, Emily was not allowed to have physical contact with any person. If any person, instructor or staff provided "feedback" as to such behavior, Emily was to "stop the behavior immediately and apologize." Furthermore, "She will not turn

away or hide her face when receiving such feedback." Failure to comply would, again, result in expulsion.

70.     As to dancing, Defendants required that if Emily was alone in her room she could "dance like nobody's watching, whatever that looks like and means to her[.]"

71.     But if Emily was "in a public place," then Emily would be required to "dance like somebody might be offended by her moves." Defendants never provided any indication as to what this meant.

72.     Furthermore, Defendants demanded, that if any additional report was received by university staff, indicating that in their "professional opinion" Emily lacked basic understanding of safety for herself or others, then "the probationary period will end immediately and Emily will be dismissed from Aggies Elevated for the year with no further notice."

73.     The following Monday, August 27, 2018, at 1:00 PM, Mrs. Arthur received a call from Defendants requiring her to be available for a 3:00 PM telephone conference.

74.      During the conference, Defendant Bodily, who was teaching Emily's connections class, reported that Emily was fiddling with her bra strap during class and inadvertently exposed "a little bit of skin and her bra." Defendant Bodily, however, later told others that Emily's had inadvertently exposed her entire breast, and she had to escort Emily out of the classroom and to the restroom. However, students in the class confirm

that in reality, Bodily took Emily to the door, pointed down the hall and told Emily to "fix her bra if she has a problem."

75.     At the conclusion of that conference, Mrs. Arthur was instructed to come pick Emily up.  Mrs. Arthur informed AE Program staff that she was working that day, and would not be available until the next day.   Further, Mrs. Arthur informed AE Program staff that if it was their intent to remove Emily from the AE Program, they would need to inform her themselves.

76.     The following day, when Mrs. Arthur arrived at USU, she was immediately ushered into a conference with Defendant Bodily, Defendant Reeves, Defendant Sheen, and Defendant Slocum.   During the course of this conference, Defendant Slocum indicated that Emily had "disrobed" in class, and that this was not the first time that Emily had "disrobed" in a public environment.

77.     Defendant Slocum, during the course of the meeting, made several references to the "danger" Emily presented to herself.  He indicated that Emily's behavior was "inviting boys to do terrible things to her" and that her behavior was likely to cause her to be "dragged into a stairwell" by a predator.  He also indicated during the meeting that he was aware that "downs kids" were prone to disrobing.

78.     The reality, however, was that Defendants were woefully unprepared to provide a TPSID program to Emily.

79.     Emily was a qualified recipient of Defendant USU's programs, services, and activities, and Defendant nonetheless repeatedly disciplined Emily, expelling her because she was a disabled person. Emily had done nothing wrong. Rather, because Emily was significantly disabled, Defendants and others at Defendant USU's facilities were uncomfortable seeing Emily in their college setting.

80.     By way of examples, in addition to the above, before Heidi Kesler physically restrained Emily and removed her from the dance, Kesler approached the dance DJ, and asked, fully and completely ignoring Emily who was sitting well within hearing range, why Emily was not dancing. The DJ responded that Emily was simply waiting for a song that she liked, and had requested. Yet, Kesler did not see fit to ask Emily or engage with Emily, but instead presumed her to be incompetent of any ability to even converse.  Further, later during the dance, when Kesler determined that Emily was dancing in a 'problematic' manner, rather than approaching Emily and requesting that she change her behavior, as Defendant Kesler would presumably have done with any other USU student, Defendant Kesler instead attempted to dance besides Emily, which caused Emily to be concerned for her safety.  Further, when Defendant Kesler removed Emily from the dance, she did not communicate to Emily who she was, why she was removing Emily from the dance, nor allow her any time to communicate with her friends that Emily had arrived with that she was being returned to her dorm.

81.     Similarly, after Defendant USU expelled Emily from the University, Mrs. Arthur shared with Defendant Slocum a letter Emily had written, expressing her feelings and emotions after being rejected from USU. Defendant Slocum responded "I had no idea she was so articulate."

82.     In addition, Defendant USU indicated to Mrs. Arthur that Emily would be a good candidate for re-admission to the program as long as she met "certain requirements".  To this day, Defendants have failed to provide concrete examples of what requirements Emily would be required to meet before Emily could be re-admitted to the program.

83.     In addition, Defendant Slocum, in his letter outlining why Emily was removed from the AE Program, cited "multiple instances" where Emily allegedly "disrobed."  This was later changed to clarify the reality of the situation, but only after significant effort on the part of Mrs. Arthur.

84.     The simple reality is that Defendant USU wanted the TPSID grant funding, but did not want to, and refused to, provide the work and supports required to effectuate the purpose of the TPSID funding.

85.     Despite promising several accommodations as part of the AE Program, including mentor and tutors trained in working with persons with Down Syndrome like Emily, guides trained in working with persons with Down Syndrome to assist the students in navigating campus, support for necessary accommodations identified on a

student by student basis (including the Google Home Mini), professors and aids who were informed about the specific requirements of working with persons with Down Syndrome, classrooms that were fully equipped to address the special needs of persons with Down Syndrome, and other accommodations advertised by the AE Program, the AE Program entirely failed to provide any of the above listed accommodations, and further directly exposed Emily to an environment that was entirely unequipped to provide the necessary support and accommodations for her.  Despite receiving significant federal funding to enable persons with Down Syndrome like Emily to attend college, the AE Program failed to take even the most basic steps to provide reasonable accommodations to allow Emily to participate in USU's programs.

86.     Upon information and belief, the failure of the AE Program to provide even the most basic of accommodations has required Think College, the non-profit organization that administers TPSID, to institute entirely new robust accreditation procedures to prevent situations like Emily's from occurring in the future.

87.     As for Emily, she went into a deep depression. She locked herself in her room, refused to socialize, refused to pursue work, and refused to undertake the very goals that she had so soon prior thereto cherished and looked forward to. The dark cloud of Emily's severe distress and depression hung over her family and household for nearly a year, wherein Emily would on a daily basis refer to the deep injury Defendant USU had inflicted by expelling her from school.

## FIRST CAUSE OF ACTION

## VIOLATION OF THE REHABILITATION ACT

88.     Plaintiff hereby incorporates each and every of the preceding paragraphs as if set forth fully herein.

89.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that: No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

90.     Emily was born with Down syndrome, and is qualified to receive Defendant USU's programs, services, and activities. As to Emily, Defendant, a public entity who receives Federal financial assistance, was required to comply with the Rehabilitation Act.

91.     As a condition to receipt of Federal financial assistance, Defendant was required to admit to the AE Program students whose disability resulted in significant limitation in intellectual and cognitive functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills.[4]

92.     As a condition to receiving Federal financial assistance, Defendant was required to ensure that at least fifty-percent (50%) of class time enjoyed by students within the AE Program was spent in the typical class setting with non-disabled peers.  In

---

[4] See https://www2.ed.gov/programs/tpsid/tpsid-2010-competition-faqs.pdf (03/23/2020).

violation of this Emily was only enrolled in one class with typical peers. Furthermore, she was forced to un-enroll in this singular class.

93.    As a condition to receiving Federal financial assistance, Defendant was required to comply with Section 504 of the Rehabilitation Act, and was thereby prohibited from discriminating against disabled students, and was affirmatively required to provide reasonable accommodations to ensure that disabled students could meaningfully enjoy the programs, services, and activities being offered by Defendant.

94.    The Defendant intentionally discriminated against Emily. Because Emily had a significant disability, Defendant admitted Emily to the AE Program, but only on a "provisional basis." Emily satisfied each of the qualifications for admittance to the AE Program.

95.    In contrast, Defendant does not "provisionally" accept nondisabled students who otherwise qualify for Defendant's programs, services and activities.

96.    The Defendant also knew that Emily required reasonable accommodations, including but not limited to, living supports in the dormitory; tutoring supports; mentor support; and technological assistance. Defendant did not provide the accommodations.

97.    Rather than provide Emily with accommodations, Defendant, through its employees and representatives, repeatedly made clear that Emily's disability made them uncomfortable. Whether it was the fact that she danced like other nondisabled students,

or whether it was the fact that she was oblivious to her fiddling with the strap of her bra, it was Emily's disability and solely her disability that made Defendant uncomfortable.

98.    And so as a result, Defendant subjected Emily to a version of college discipline that was wholly unlike that experienced by nondisabled students.

99.    If Emily was late to class, even once, she would be dismissed. If Emily engaged in any human-to-human contact, she would be dismissed. If Emily failed to respond to any call, text, or voicemail, she would be dismissed. And if Emily used her phone in class, even once, she would be dismissed.

100.    The intentional nature of the Defendant's discrimination is further shown by express statements by Defendant's employees and representatives. Namely, Emily had to provide notices if she was "running late, *lost, whatever*." Similarly, when alone "she can dance like nobody's watching, *whatever that looks like and means to her*." These written statements both evidenced discriminatory intent, aimed at Emily, demeaning and disciplining her for nothing but her disability. Similarly, if in public, Emily would have to "dance like somebody *might be offended* by her moves." (emphasis). Implicit in this the Defendant's requirement upon Emily was the assertion that because Emily was disabled, she had to be "extra careful" not to offend anyone with her dancing.

101.    As a result of Defendant USU's intentional discrimination against Emily, Emily was degraded, dehumanized, and humiliated. She suffered emotional distress, pain,

and suffering. Emily was also denied the benefits of a federally funded transition into higher education and equally important, independent living.

102.    The full amount of Emily's damages, both general and special in character, are to be determined at the time of trial.

## SECOND CAUSE OF ACTION
## DISCRIMINATION BASED ON DISABILITY – TITLE II OF THE ADA

103.    Plaintiff hereby incorporates each and every of the preceding paragraphs as if set forth fully herein.

104.    Plaintiffs restate the prior allegations, incorporating them herein by reference as if restated with full force and effect.

105.    Defendant USU is subject to the requirements of Title II of the Americans with Disabilities Act ("ADA"). Said Defendant is an instrumentality of the state of Utah, and also receives funding from one or more federal sources in providing educational programs, activities, and services to the public.

106.    Plaintiff is a "qualified individual with a disability" as defined by 42 U.S.C. § 12131(2). As set forth supra, Plaintiff was a student of Defendant, and is both physically and cognitively disabled.

107.    The ADA and its implementing regulations require that accommodations be provided so that qualifying persons with disabilities can meaningfully have equal access to the services, programs, and activities provided by a public entity.

108.   Defendants knew Emily was disabled, and Defendant knew that for Emily to meaningfully participate in and have equal access to Defendant's services, programs, and activities, that Emily required one or more accommodations.

109.   Defendant did not provide the accommodations.

110.   As a result of Defendant's denial of accommodations, Emily was excluded from Defendant's services, activities, and programs. Indeed, the reasons for Emily's dismissal, cited to by Defendant Reeves were that Emily was unable to manage her own schedule without technological assistance, which was the direct product of Emily's disability; and that Emily reacted to discipline less maturely than her nondisabled counterparts, which again, was the direct product of Emily's disability.

111.   In addition to the lack of accommodations and resulting exclusion, Defendant's discrimination also resulted in the affirmative removal of Emily's rights, benefits, and enjoyments without due process of law. Defendant USU is a public entity, and though it provides its nondisabled students with due process before revoking a right, benefit, or enjoyment of Defendant's services, activities, or programs, no such due process was provided to Emily.

112.   Because of Defendant's disability, without due process Defendant Heidi Kesler physically dragged Emily away from a school-sponsored dance for nothing more than ordinary, age-appropriate dance behavior. Because of Defendant's disability,

Defendant predetermined to dismiss Emily, well before investigating, let alone providing Emily with any due process.

113.   Furthermore, in addition to the lack of accommodations and resulting exclusion; and in addition to the Defendant's removal Emily's rights, benefits, and enjoyments absent due process of law; Defendant's discrimination resulted in the unequal, unjust, and inhumane punishment of a student.

114.   Defendant USU is a public entity, and as such takes steps to ensure that discipline meted out against its nondisabled students is fair, consistent, and reasonable. A nondisabled student admitted to USU does not get permanently dismissed because he or she arrives to orientation classes late. A nondisabled student admitted to USU does not get permanently dismissed if he or she utilizes his or her phone in class. A nondisabled student is not dismissed for failing to 'check in' twice a day with three (3) separate people per day.

115.   Yet because Plaintiff Emily is disabled, her discipline was not a tardy; rather, it was dismissal. Her discipline was not a revocation of phone privileges during class; rather, it was dismissal. Indeed, the punishment was inhumane, requiring Emily to "check in" twice a day with three (3) separate people per day, all the while being fully aware that Emily lacked such ability absent the accommodations that Defendant was refusing to provide.

116.   Defendant violated the ADA and intentionally discriminated against Plaintiff.

117.   Defendant did not perform any analysis of, and cannot show that providing Emily with her needed accommodations would result in a fundamental alternation of Defendant's programs, activities, or services. See *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003).

118.   By failing to appropriately provide Emily with the accommodations, Defendant failed to provide services to Emily in the "most integrated setting" appropriate.

119.   Denying Plaintiff the equal or same opportunity to receive the benefit(s) of Defendant's programs, activities, and services, which are available to other qualified individuals, violates the ADA.

120.   Defendant's above acts and omissions were done intentionally, with willful misconduct, or with deliberate indifference towards Plaintiff's rights as qualified disabled person. Such intent is, in addition to those matters set forth above, evidenced by the overt public humiliation and denial of equal access that Plaintiff received at Defendant's hands, and by the false pretext provided by Defendant, that such discrimination and exclusion was to keep Plaintiff 'safe' and away from being "dragged under the stairwell" by an unknown predator.

121.   As a result of Defendant USU's intentional discrimination against Emily, Emily was degraded, dehumanized, and humiliated. She suffered emotional distress, pain, and suffering. Emily was also denied the benefits of a federally funded transition into higher education and equally important, independent living.

122.   The full amount of Emily's damages, both general and special in character, are to be determined at the time of trial.

**THIRD CAUSE OF ACTION**
**FIFTH AND FOURTEENTH AMENDMENTS – 42 U.S.C. § 1983**
**(Individual Defendants and DOES 1 through 50)**

123.   Plaintiff hereby incorporates each and every of the preceding paragraphs as if set forth fully herein.

124.   Plaintiffs restate the prior allegations, incorporating them herein by reference as if restated with full force and effect.

125.   For all times relevant herein, Defendant Sarah Bodily is the Director of the Aggies Elevated Program, a.k.a. the AE Program.

126.   For all times relevant herein, Defendant Timothy A. Slocum is the Department Head, and Defendants Jeff Sheen and Sue Reeves were staff within the AE Program.

127.   After Emily's 10:30am classes had ended, Defendant Reeves had Emily come to her office to review and sign the behavior contract. Defendant Reeves ensured that Emily came to review and sign the contract without parental support or legal representation.

128.   The behavior contract was intentionally humiliating and demeaning towards Emily's disability. Examples of such discriminatory and demeaning language include: penalties if Emily is "running late, *lost*, whatever"; "she can dance like nobody's watching, *whatever that looks like and means to her*"; and "she has to dance *like somebody might be offended* by her moves." (emphasis).

129.   To present the behavior contract to Emily without a legal or parental representative, and to do so in demeaning and humiliating manner, violated Emily's due process rights as guaranteed under the Fifth and Fourteenth Amendments.

130.   Defendants Slocum, Bodily, Sheen, and Reeves were all aware of the humiliating contract, had participated in its making, and had approved Reeves in giving Emily the proposed contract. Each of these Defendants also knew that the contract itself was a sham due process attempt. Days before giving Emily the contract to review, these same Defendants declared that it is "our intentions to release Emily from the program at this time."

131.   The behavior contract was itself a deprivation upon Emily's life, liberty, and property, restricting her movements, and subjecting her to an immediate loss of enjoyment in the Defendant USU's services, programs, and activities without any opportunity to contest the accusations raised against her.

132.   Defendants, clearly violated Emily's constitutional right to due process prior to the confiscation of her life, liberty, and property.

133.    Defendant Slocum, who dismissed Emily from the AE Program, did so in concert with the other above named individual Defendants. They did not provide Emily with due process; they did not provide Emily's parents with any mechanism by which they might seek to enforce Emily's rights. Therefore, Defendants' dismissal of Emily, which was performed in concert, constituted a deprivation of Emily's due process rights under the Fifth Amendment, as imputed to the States by the Fourteenth Amendment.

134.    Defendant Kesler's physical restraint and removal of Emily from the school-dance also constituted a deprivation of Emily's liberty, without due process of law.

135.    Furthermore, Defendants did not apply Defendant USU's laws with equality. The TPSID program, as set forth under 20 U.S.C. §§ 1140f, et. seq., was created to promote the successful transition of students with intellectual disabilities into both higher education and independent living.

136.    Defendant USU is a creature of the State. See U.C.A. §§ 53B-2-101, et. seq. As such, the Board is empowered to enact regulations "governing the conduct of university and college students, faculty, and employees." Id. at § 53B-3-103(1). Furthermore, Defendant USU is empowered to enforce these regulations, to assess fees, fines, forfeitures, impose probation, suspension, or expulsion, or revoke privileges, refuse to issue certificates, or deny a student any degree or diploma. U.C.A. § 53B-3-103(4).

137.   By virtue of the Fourteenth Amendment of the United States Constitution, the enforcement of such regulations constitute a state action, no different than the enforcement of a law; which regulations constitute the basis by which a student's liberty, property, and rights may be taken away.

138.   Defendant Slocum violated the Fourteenth Amendment when he dismissed Plaintiff through the unequal application of the Defendant USU's governing regulations. Defendant Kesler violated the Fourteenth Amendment when she physically restrained and removed Plaintiff from a school-sponsored dance through the unequal application of the Defendant USU's governing regulations. And Defendants Slocum, Bodily, Reeves, and Sheen violated the Fourteenth Amendment when they subjected Plaintiff Emily to immediate dismissal absent compliance with vague, confusing, and impossible regulations.

139.   Defendant USU does not dismiss its students for a single tardy. Defendant USU does not dismiss its students for a singular use of his or her phone during class. Defendant USU does not dismiss its students for dancing awkwardly. Defendant USU does not dismiss its students for a medical condition that might make another student feel uncomfortable. And Defendant USU does not allow untrained professors to render a professional opinion about whether a student's medical condition renders that student incapable of receiving an education or being otherwise unqualified to receive Defendant USU's services, activities, and programs.   Furthermore, Defendant USU has strict

policies and procedures in place regarding the process of dismissal, which were not followed in Emily's case.

140.    Under the Fifth and Fourteenth Amendments to the Constitution of the United States of America, each person's life, liberty, and property are protected by due process of law and the equal protection of such laws.

141.    Defendants' conduct, as set forth above, was in violation of the Fifth and Fourteenth Amendments of the United States Constitution, and as set forth above was committed intentionally against Emily to the deprivation of her life, liberty, and property. As set forth above, Defendants' other reasons for engaging in such deprivations are pretextual, and were at the least committed with reckless disregard for Plaintiff's well known federal rights under the United States Constitution.

142.    As a result of the Defendants violation of Emily's constitutional rights, Emily has been damaged. She was degraded, dehumanized, and humiliated. She suffered emotional distress, pain, and suffering. Emily was also denied the benefits of a federally funded transition into higher education and, equally important, independent living.

143.    The full amount of Emily's damages, both general and special in character, are to be determined at the time of trial.

## DEMAND FOR JURY TRIAL

144.    Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

145.   Plaintiff respectfully requests that this Court enter Judgment in favor of Plaintiff and against Defendants for the following:

a. Special damages;

b. General damages;

c. Declaratory relief consistent with that relief requested herein;

d. Prejudgment interest;

e. Post judgment interest;

f. Attorney's fees as allowable under contract, law, or otherwise; and

g. Any other relief that the Court deems just and equitable under the circumstances.

DATED this 15th day of October, 2020.

BEARNSON & CALDWELL, LLC


/s/ Aaron K. Bergman
Aaron K. Bergman
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of October, 2020, a true and correct copy of

the foregoing **FIRST AMENDED COMPLAINT & JURY DEMAND** was delivered to

the following persons via email and/or e-filing:


    Darin B. Goff
    Kyle Kaiser
    Section Director, Civil Rights Section
    Litigation Division
    Utah Attorney General's Office
    Email: dgoff@agutah.gov
    Email: kkaiser@agutah.gov


*/s/Aaron K. Bergman*
Aaron K. Bergman, attorney